RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

IN RE: JASON ROBERT WYLIE; LEAH S. WYLIE,

                          *Debtors*.

─────────────────────────────────

KATHLEEN SULLIVAN,

                          *Appellant*,

     *v.*

TIMOTHY J. MILLER, Trustee,

                          *Appellee*.

No. 25-1773

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:24-cv-12837—Mark A. Goldsmith, District Judge.

───────────────

Nos. 2:20-bk-49216; 2:21-ap-04186—Thomas J. Tucker, Bankruptcy Judge.

Argued: July 29, 2026

Decided and Filed: August 6, 2026

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Thomas R. Morris, MORRIS & MORRIS ATTORNEYS, P.L.L.C., Dexter, Michigan, for Appellant. Jeffrey H. Bigelman, OSIPOV BIGELMAN, P.C., Southfield, Michigan, for Appellee. **ON BRIEF:** Thomas R. Morris, MORRIS & MORRIS ATTORNEYS, P.L.L.C., Dexter, Michigan, for Appellant. Jeffrey H. Bigelman, OSIPOV BIGELMAN, P.C., Southfield, Michigan, for Appellee.

—————————

**OPINION**

—————————

SUTTON, Chief Judge.  After illness prevented Jason Wylie from running his farm and business, he filed for bankruptcy.  The trustee of the estate filed a lawsuit alleging that Wylie improperly conveyed several pieces of real property to his mother, Kathleen Sullivan, soon before his Chapter 7 filing.  The bankruptcy court avoided one of the property transfers, requiring Sullivan to return it to Wylie's estate and to make its value available for other creditors.  The district court affirmed.  Seeing no error, we affirm.

I.

This case arises from nearly a decade's worth of property purchases, contracts, and monetary exchanges between Jason Wylie (business owner, farmer, and General Motors engineer) and Kathleen Sullivan (his mother).  Here are the key events and transfers for today's purposes.

In January 2011 and June 2014, Sullivan transferred three properties to Wylie by quitclaim deed—clear, that is to say, of any liens or warranties—and Wylie took out mortgages owed to Sullivan in each instance.  Sullivan and Wylie amended the 2011 mortgages in 2014, changing some of the terms and lowering the interest rates, and Wylie paid one of the January 2011 mortgages in full that year.  Sullivan also loaned $200,000 to Wylie's business, Wylie's Rentals & Excavation, Inc., in 2011.  Sullivan and Wylie's Rentals renegotiated the terms of that loan and lowered its interest rate in 2014.

In 2017, Wylie asked to borrow $10,000 from his mother.  Sullivan agreed and allowed Wylie to take the money for himself, using access he had through his power of attorney in Sullivan's bank accounts.  Instead of borrowing $10,000, however, he took $43,000.  Wylie later paid Sullivan back only $10,000, keeping the rest for himself.  While Sullivan eventually ended Wylie's power of attorney, their business and family relationships endured.

In early 2018, Wylie underwent treatment for cancer. He became too sick to farm, forcing him to ask neighboring farmers to harvest his crops. His businesses defaulted and he became insolvent. Creditors repossessed Wylie's farm equipment and vehicles, then sued him to obtain the rest of the money that he owed them. At roughly the same time, Wylie stopped making payments to Sullivan on his mortgages.

In August 2019, in the midst of navigating these financial straits, Wylie transferred all three of the pieces of real property he purchased from Sullivan back to her by quitclaim deed. Two of the three properties still had mortgages. To settle the debt, Sullivan and Wylie entered into a written "Mutual Release in Full." R.3 at 124–25. The agreement extinguished claims "related to the [m]ortgages and [p]romissory [n]otes" from the relevant dates and "acknowledge[d] full settlement and satisfaction" in exchange for the three quitclaim deeds. R.3 at 124.

In August 2020, Wylie filed for bankruptcy under Chapter 7 and sought to discharge nearly $2 million in debt. The trustee sued Sullivan to avoid the transfer of one of the transferred properties, alleging that Wylie conveyed it to her in order to shield the asset from his creditors. The trustee claimed that the transfer was constructively fraudulent because Wylie "received less than a reasonably equivalent value in exchange for [the] transfer." 11 U.S.C. § 548(a)(1)(B)(i). To remedy the fraud, the trustee asked the court to return the property to the bankruptcy estate to permit all of Wylie's creditors to share in it. *See id.* §§ 550–551.

At trial, the bankruptcy court found that Wylie transferred properties to Sullivan worth $893,000 in exchange for a release from $737,516 of individual debt. It determined that the difference between these two amounts, $155,484, meant that Wylie did not receive "a reasonably equivalent value" for the property, making the transfer "constructively fraudulent." R.3 at 663–65; *accord* 11 U.S.C. § 548(a)(1)(B)(i). The court ordered Sullivan to return one of the properties to the estate. Sullivan sought review in the district court. It affirmed the bankruptcy court's order.

II.

Sullivan challenges this decision in several ways.  Before proceeding, it bears noting that we review the bankruptcy court's decision directly and give fresh review to its conclusions of law.  *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 849 (6th Cir. 2002).  We review its factual findings for clear error, giving particular deference to credibility determinations.  *Id.*; *see Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).  In doing so, "we accord no deference to the district court's decision." *Cannon*, 277 F.3d at 849.

*2011 business loan.*  Sullivan's first challenge turns on the meaning of a business loan between her and Wylie Rentals, a company owned by her son.  Sullivan claims that her son personally guaranteed the 2011 loan from Sullivan to Wylie Rentals and that the bankruptcy and district courts erred in declining to account for the relinquishment of that personal guaranty when he returned the real property to her.  This contention rises or falls based on the meaning of the loan agreement.

We address questions of contract interpretation afresh, as they are questions of law. *United States v. Century Offshore Mgmt. Corp.* (*In re Century Offshore Mgmt. Corp.*), 111 F.3d 443, 448 n.3 (6th Cir. 1997).  And we apply Michigan law in doing so, as the parties agree.  *See Off. Comm. of Unsecured Creditors v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 676 (6th Cir. 2006).

Under Michigan law, the goal of contract interpretation is to honor the parties' intent as "embodied in the actual words used in the contract itself." *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 124 (Mich. 2005).  At issue in this case is whether the parties, through the words of the relevant contract, meant to obligate only the company or to obligate Jason Wylie in his individual capacity as well.  Put another way, did the contract simultaneously obligate the company to pay back the loan *and* create a personal guaranty by its president that he would repay the loan if the company could not?

Two presumptions under Michigan law affect the resolution of this case.  The first is that Michigan law generally does not hold officers of a corporation liable for the corporation's debts or contracts.  *See, e.g.*, *Thomas v. Khrawesh*, 272 F. Supp. 3d 995, 1001 (E.D. Mich. 2017);

*Lexon Ins. Co. v. Naser*, 781 F.3d 335, 340–41 (6th Cir. 2015). The second stems from the signature blocks on a loan agreement. Michigan law presumes that a loan agreement creates a personal guaranty in one setting (where there are two signature blocks and one of them is for personal liability) but not in the other (where there is only one signature block). "[A]s a general rule, . . . where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (quotation omitted). One signature block thus typically indicates that the officer signs the contract in his official capacity as an officer of the company and obligates the company in doing so. Two signature blocks allow the agreement to convey that the officer also signs the contract in his individual capacity, creating a guaranty that his personal assets will back up any failure by the company to repay the loan. When an officer signs the contract only once, Michigan law looks to the descriptors in the signature block and the language used to refer to the parties in the body of the contract to interpret the parties' obligations. *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 336 (6th Cir. 2018) (applying Michigan law); *cf. Naser*, 781 F.3d at 341 (same).

Measured by these principles, Wylie did not personally guarantee this loan to Wylie Rentals. The parties signed the original loan agreement on January 17, 2011. They renegotiated the agreement in 2014, and the 2014 promissory note rendered "null and void" "[t]he [contract] dated . . . 1/17/2011." R.3 at 93. Neither party contests this point, which means that this dispute turns on the 2014 loan agreement.

The 2014 agreement contains one signature block and ambiguously lists Wylie as signing the agreement as the "President" of Wylie Rentals and "individually." R.3 at 60. The word guarantee (or guaranty) does not appear in the 2014 agreement or for that matter in the 2011 agreement. In the absence of two clearly delineated signature blocks, one in a representative capacity and one in a personal capacity, we cannot presume that Wylie signed the agreement with an intent to personally guarantee repayment of the loan in full. *Innovation Ventures*, 912 F.3d at 336; *see also Livonia*, 742 N.W.2d at 146. That requires us to look for other indicators of meaning in the body of the contract. *See Innovation Ventures*, 912 F.3d at 336.

The body of the contract shows that Wylie's Rentals is the only obligor. The contract says three times that Wylie's Rentals—and only Wylie's Rentals—shouldered the burden of repaying Sullivan roughly $200,000. Look at each instance: (1) "Wylie's Rental[s] . . . promises to pay to the order of Kathleen W. Sullivan . . . the principal sum of Two Hundred Thousand [dollars]"; (2) "principal and interest shall be paid by Wylie Rental[s]"; and (3) "Payer: Wylie's Rental[s]." R.3 at 93. The body of the contract thus makes just one entity liable: Wylie's Rentals.

The one signature block, it is true, says that Jason Wylie signed the agreement as "President" of Wylie Rentals and "individually." But as the bankruptcy and district courts found, there is a legitimate explanation for the addition of the word "individually." *See, e.g., Rossello v. Trella*, 172 N.W. 420, 421 (Mich. 1919); *cf. Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 452 (Mich. Ct. App. 2018). The loan agreement contains a provision that requires the company to obtain a life insurance policy on Jason Wylie that "backed" the company's repayment obligation in the event of the death of the company's President, Jason Wylie. R.3 at 93. The term thus does not create a personal guaranty by Jason Wylie to repay the loan. It just requires the purchase of a life insurance policy on him as an individual and requires the parties to use the proceeds of the policy, if necessary, to pay off the loan in the event that he dies.

Sullivan's contrary arguments fall short. She claims that Wylie's signature block appears under the word "Payer," making him individually liable on the note. But she cuts off the quotation at an advantageous point. The full line above Wylie's signature reads: "Payer: Wylie's Rental[s]." R.3 at 93. The complete text of the contract thus hurts Sullivan more than it helps her. It would have been easy to list Wylie individually as a Payer, the Payer, or a guarantor. But those words do not appear in the contract.

Sullivan points out that the contract says that Wylie's life insurance policy would "appl[y] to any other indebtedness owed by Jason R. Wylie" if the policy value exceeded the amount owed to Sullivan. R.3 at 93. She argues that the phrase "other indebtedness" suggests that this debt covers personal indebtedness. We see the point. But it does not alter the best reading of the contract. The question is whether Jason Wylie personally guaranteed the underlying loan. That the company was obligated to take out an insurance policy on him

confirms *its* obligation to repay Sullivan.  The phrase "any other indebtedness" describes what would happen "in the event of the death of Jason Wylie"—and indicates only that excess proceeds would cover *other* debts Jason owed his mother.  R.3 at 93.  While it introduces the existence of personal debts outside this contract, it does not show that the underlying contract created a guaranty by Jason Wylie in his personal capacity.  The good news is that Wylie did not die.  The bad news (for purposes of this case) is that he owed Sullivan nothing personally on the contract.

Sullivan tries to introduce ambiguity into the contract based on extrinsic evidence introduced at the bankruptcy court hearing.  While Michigan courts typically limit their review to the four corners of the contract, *Phillips v. Homer* (*In re Smith Tr.*), 745 N.W.2d 754, 758 (Mich. 2008), the trustee does not contest the bankruptcy court's decision to admit extrinsic evidence under Michigan's "stranger-to-the-contract" exception to the parol evidence rule, *see Shay v. Aldrich*, 790 N.W.2d 629, 636 (Mich. 2010).  Neither the testimony at trial nor the post-agreement documents, however, permit us to re-cast the 2014 contract to create personal liability for Wylie.

Begin with the testimony at trial.  While Sullivan and Wylie testified that they intended to impose personal liability on Wylie, the bankruptcy court found otherwise.  It found that their testimony lacked credibility, as it appeared to be motivated by a desire to keep the property in the family rather than in the hands of non-family creditors.  Sullivan offers no specific reason why we should overturn this lack-of-credibility finding other than to say that we should trust her.  But credibility questions are usually best handled by those with a front-row seat of the testimony. *See Anderson*, 470 U.S. at 575.  We see no good reason for ignoring that insight here.

Turn to Sullivan's post-agreement documents.  Sullivan points to two documents:  (1) a 2018 affidavit in which she included the contested loan in a list of Wylie's personal debts to her, and (2) the 2019 Mutual Release in which she attempts to forgive this loan in connection with Wylie's return of the properties.  Because she created the documents "subsequent to the execution of the contract," and because they suffer from the same self-interest (keeping the property for herself) that infected her trial testimony, they "are not controlling factors in determining [the contract's] intention." *Nelson v. Big Rapids Gas Co.*, 300 N.W. 89, 95

(Mich. 1941). On top of that, the documents do not purport to reveal "the intention of the parties" when they executed the contract, making them a dubious basis for construing it. *Id*. at 94.

Sullivan maintains that Wylie gave an oral guaranty that he would pay the loan. The district court found that she forfeited this argument by failing to raise it in the bankruptcy court. We agree. Sullivan offers no good reason for overturning this forfeiture ruling.

*2017 conversion damages*. Sullivan claims that the 2019 Mutual Release between her and Wylie satisfied her claim for damages stemming from Wylie's conversion of $33,000 from her bank account. This argument, too, turns on the intent of the parties as expressed through the four corners of the agreement. *See In re Century Offshore Mgmt. Corp.*, 111 F.3d at 449; *In re Dow Corning Corp.*, 456 F.3d at 676.

The release does not reach Sullivan's conversion damages. It extinguished Sullivan's potential claims "related to the Mortgages and Promissory Notes dated January 17, 2011, January 27, 2011, June 18, 2014 and any renewals or modifications thereof." R.3 at 124. Wylie's 2017 conversion does not fit the bill. Sullivan and Wylie never executed a contract concerning repayment of the converted money, and no evidence shows that the parties included Wylie's conversion debt in an existing mortgage or contract.

Sullivan insists that the name of the release, "Mutual Release in Full," R.3 at 124, shows that she intended to relinquish all possible claims she could have against Wylie, including outstanding debts not listed within the contract. But all parts of a contract "must be harmonized as much as possible." *Smith v. Smith*, 823 N.W.2d 114, 116 (Mich. Ct. App. 2011) (per curiam). The title of the document does not expand the parties' obligations beyond the dispositive direction of its expressed terms. *See Scott v. Farmers Ins. Exch.*, 702 N.W.2d 681, 684 (Mich. Ct. App. 2005) (per curiam). The release was "in Full" because Sullivan fully released "any and all claims" concerning the listed mortgages and promissory notes, not because the agreement reached debts that its terms did not cover. R.3 at 124.

Sullivan maintains that she should get relief even if we limit the release to its terms. She argues that the conversion "related to" the several "Mortgages and Promissory Notes," R.3

at 124, because the money Wylie took from Sullivan's account came from his own payments for the properties. Other than the never-ending idea that "everything is related to everything else," *Calif. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring), this argument stretches "related to" well past its breaking point and well past a fair-minded reading of the agreement.

Sullivan's extrinsic evidence does not help matters. The bankruptcy court found Sullivan's testimony that the release included conversion damages incredible and contradicted by Wylie's testimony. While Sullivan disagrees with the bankruptcy court's conclusion, she offers no fair-minded reason to challenge its reasoning. *See Anderson*, 470 U.S. at 575. Her claim that the bankruptcy court gave too much weight to her lawyer's testimony—the same testimony she relied on in her own post-trial brief—falls flat. The best way to deal with this conflicting testimony, as the bankruptcy court sensibly found, was to return to the text of the contract.

*Property recovery*. The bankruptcy court awarded the trustee the paid-off property rather than the $155,483 difference between Wylie's two mortgages and the three homes. Once a bankruptcy court avoids a transfer, it retains discretion to decide whether the trustee "may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550. Given the bankruptcy court's "broad discretion" under the statute, we will uphold its decision absent an abuse of that discretion. *See AMC Mortg. Co. v. Tenn. Dep't of Revenue* (*In re AMC Mortg. Co.*), 213 F.3d 917, 920 (6th Cir. 2000); *see PCFS Fin. v. Spragin* (*In re Nowak*), 586 F.3d 450, 454 (6th Cir. 2009); *Indus. Ins. Servs. v. Zick* (*In re Zick*), 931 F.2d 1124, 1126 (6th Cir. 1991). No abuse of discretion occurred.

Wylie gave Sullivan three properties in exchange for a release from the mortgages on two of the properties. After looking carefully at these exchanges between the mother and her son, the bankruptcy court reasonably required Sullivan to return the third, paid-off property to the estate. In protesting this conclusion, Sullivan offers a reading of § 550 that would *require* the bankruptcy court to view the exchange solely in terms of value. That approach runs into two steep hurdles. One is that Congress gave bankruptcy courts discretion to decide whether to approach recovery in terms of property or in terms of value. In its words, the bankruptcy court "may" award "the property transferred, or, if the court so orders, the value." 11 U.S.C. § 550.

Without the "definite and clear conviction" that the bankruptcy court made an error, we may not second guess it. *AMC Mortg. Co.*, 213 F.3d at 920 (quotation omitted). The other problem is that Sullivan failed to make any argument contesting the property recovery below, and we decline to review issues not raised before the bankruptcy court. *New Prods. Corp. v. Dickinson Wright, PLLC* (*In re Mod. Plastics Corp.*), 890 F.3d 244, 253 (6th Cir. 2018). While she claims that she had no notice that the trustee would pursue property recovery, the record belies her claim. The complaint and the final pretrial order, as it happens, set out the trustee's request for recovery of the transferred property. At all events, Sullivan may still have a claim against the bankruptcy estate for any value she thinks Wylie now owes her. *See* 11 U.S.C. § 502(h).

*Proposed order*. Sullivan criticizes the district court for adopting the trustee's proposed order. There is room for disagreement about whether the court's approach is a wise one. That said, when a busy court faced with time exigencies relies on a party's proposed order, that does not automatically sink to reversible error. *Anderson*, 470 U.S. at 572.

We affirm.